IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **00-cv-02229-JLK**

**CAUGHT FISH ENTERPRISES, LLC, a Colorado limited liability company, and
METAL ROOF INNOVATIONS, LTD., a Colorado corporation**

Plaintiffs,

v.

**CONTEK, INC., d/b/a SNOW MANAGEMENT SYSTEMS, a Vermont
corporation,**

Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Kane, J.

Plaintiffs Caught Fish Enterprises, LLC ("Caught Fish") and Metal Roofing

Innovations, Ltd. ("MRI") (collectively "CFE") allege Defendant Contek, Inc. ("Contek")

has infringed on certain claims in CFE's U.S. Patent Nos. 5,228,248 ("'248 patent") and

5,983,588 ("'588 patent"). Determination of this suit will proceed in two steps. First, the

court must decide the meaning and scope of the patent claims asserted to be infringed.

*See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc),

*aff'd*, 517 U.S. 370 (1996). Second, the finder of fact must compare the properly

construed claims to the device accused of infringing. *Id.* This matter is before me on the

first of these steps, commonly referred to as claim construction.

Upon consideration of the parties' respective briefs, supplemental submissions and oral argument on the disputed claim terms, I entered an order generally adopting CFE's proposed construction of the disputed terms and notifying the parties that a written opinion would follow. *See* Order (Doc. 59). The findings and rationale for my claim construction decision are set forth in this opinion.

<u>Background</u>

CFE and Contek compete in the manufacture and sale of snowguards designed for controlling the movement of snow and ice deposited on metal roofs.[1] CFE's asserted patents and Contek's accused product both relate to this field, and especially to the device for attaching a snowguard to a metal roof.

It is undisputed that metal roofs are generally comprised of a number of water-tight metal roofing panels laid side-by-side to cover a selected roof section. The roof panels have standing edges on their left and right sides, and are situated so that their standing edges abut and form a seam. Roofers then crimp the standing edges and/or fold them over each other to form a side joint, also referred to as a standing seam, which prevents water from penetrating the roof panels.

The asserted patents arise out of the inventions of Robert Haddock, who holds an ownership interest in both Caught Fish and MRI, and his design of a clamp-type

---

[1]     Snowguards function as a barrier on metal roofs to prevent the movement of ice and snow down the pitch of the roof or to funnel snow and ice to designated fall off areas.

mounting device to secure structures, such as snowguards, to the standing seam of a metal roof.  Haddock's mounting device consists of a machined block of metal and several fasteners.  The metal block includes a hollow cavity or slot designed to surround a standing seam, as well as bores or holes to accept fasteners or to attach snowguard cross-members or other items to it.  In operation, the metal block is positioned over the roof seam and is secured by several blunt-nosed screws that rotate into contact with the seam through threaded side surface holes that extend from the outside surface of the block to its hollow cavity.  The device utilizes blunt-nosed fasteners instead of fasteners terminating in sharp or flat ends because the blunt end enables the fastener to frictionally engage the metal roof seam without puncturing or galling it in a manner that would allow water to penetrate the seam.

The U.S. Patent and Trademark Office ("PTO") granted Haddock several patents covering different aspects of his roof clamp system, including the '248 patent in 1993 and the '588 patent, a continuation-in-part of the '248 patent,[2] in 1999.  Haddock subsequently assigned the asserted patents to Caught Fish, which then licensed them to MRI.

Defendant Contek manufactures and sells its own device for mounting snowguards on the standing seam of metal roofs.  Like CFE's mounting apparatus, Contek's device

---

[2]      A continuation-in-part patent application contains subject matter from the prior application and may also contain additional matter not disclosed in the prior application. *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1302 (Fed. Cir. 1999).

utilizes a threaded fastener that passes through holes in a metal block and frictionally engages the standing seam with a blunt-nosed device.  As relevant here, the difference between Contek's mounting apparatus and CFE's apparatus is that Contek's fastener is not a unitary piece but rather has two parts, a threaded cylinder with a concave nose and a separate blunt object, such as a ball bearing, "circle-lok" modified ball bearing or "sure grip pad," that fits into the cavity in the concave nose of threaded cylinder and frictionally engages the roof seam when the cylinder is rotated through the threaded hole. Contek asserts the functionality of its multi-part fastener improves on the unitary fastener utilized by CFE because the blunt end of the Contek fastener does not rotate against the metal seam, thus protecting the seam from possible paint removal or galling that could damage it, and because the two-part design allows the fastener to disengage or release under heavy snow loads, which can protect the roof from damage that might otherwise occur.  Contek has obtained several patents for its snowguard mounting assembly, including U.S. Patent No. 5,613,328 ("'328 patent"), issued in 1997, and U.S. Patent No. 6,318,028 ("'028 patent"), issued in 2001.

CFE's and Contek's mounting devices also differ in the manner in which the cross-member (snowguard) that spans the distance between the seams is connected to the apparatus mounted on the standing seam.  Under CFE's patents and products based on them, the cross-member attaches directly to the metal block or clamp that is fastened to the standing seam.  *See* Pls.' *Markman* Br. (Doc. 33), Ex. 2 [hereinafter "'248 patent], fig. 3a; *id.*, Ex. 3 [hereinafter "'588 patent"], fig. 3a.   In Contek's accused products, the

cross-member connects to an intermediate structure, a bracket, that is attached to the metal block.  *See, e.g.*, Stipulated Exs. at *Markman* Hearing, Ex. 15 (Contek clamp);[3] Pls.' *Markman* Br., Ex. 7 [hereinafter "'328 patent], fig. 1.

CFE alleges that Contek's mounting device infringes Claims 1-4, 6, 9, 10 and 13 of the '248 patent and Claims 1-12, 14-17, 19-35, 37-40 and 42-53 of the '588 patent. The parties dispute the scope and meaning of certain terms recited in some of these claims.  By stipulation of the parties, the disputed terms are:  (1) "blunt-nosed screw" or "screw" as recited in Claim 1 of the '248 patent and Claims 1, 9, 15, 25, 32, and 38 of the '588 patent; (2) "member positionable within said first hole and being extendable within said slot" and similar language as recited in Claims 20, 43 and 48 of the '588 patent; (3) "interconnected with" as recited in Claim 1 of the '248 patent; and (4) "securing" as recited in Claims 9 and 32 of the '588 patent.

Claim Construction Principles

The claims of a patent define the invention to which the patentee is entitled. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  The Federal Circuit and Supreme Court have held that construction of patent claims to determine their scope and meaning is a pure question of law to be decided solely by the court.  *Markman*,

---

[3]       The parties stipulated to the admission of this and other exhibits in advance of the *Markman* hearing in this action.  *See* Jt. Notice & Stip. Concerning *Markman* Hearing (Doc. 54) at 6-7 & Ex. 2.  As is the case with trial exhibits, it is ordered that counsel for the parties retain custody of their respective hearing exhibits until such time as all need for the exhibits has terminated and the time to appeal has expired or all appellate proceedings have been terminated plus sixty days.

52 F.3d at 979; *id*, 517 U.S. at 384-86.  This task requires that I examine the language of the claims, the patent specification and the prosecution history, all referred to as intrinsic evidence, to determine the "ordinary and customary meaning" of the disputed claim terms to a person of ordinary skill in the art in question at the time of the invention.  *Phillips*, 415 F.3d at 1313.  In considering the specification, however, I must take care not to import limitations from it into the claims.  *Id.* at 1315, 1319-20; *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998); *see also Rhine v. Casio, Inc.*, 183 F.3d 1342, 1346 (Fed. Cir. 1999) ("particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments;" internal quotation omitted).  I may also consider evidence extrinsic to the asserted patents, such as dictionary definitions, in construing the terms of a claim, so long as I consider the extrinsic evidence in the context of the claim language, specification and prosecution history, and the extrinsic evidence does not contradict any definition found in or ascertained from this intrinsic evidence.  *See Phillips*, 415 F.3d at 1319-20, 1322-23.

The same terms appearing in different claims in the same patent "should have the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims."  *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006) (internal quotation omitted); *see Phillips*, 415 F.3d at 1314.  Unless the intrinsic evidence compels a different conclusion, I must also give a claim term "the full range of its ordinary

meaning as understood by persons skilled in the relevant art." *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1357 (Fed. Cir. 2003); *see Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

At different points in their briefs, the parties debate whether and to what extent I may consider Contek's accused device in construing the asserted patents. Under Federal Circuit authority, it is proper for a district court to consider the accused device in order to identify and "concentrate on those aspects of the claim whose relation to the accused device is in dispute." *Pall Corp. v. Hemasure, Inc.*, 181 F.3d 1305, 1308 (Fed. Cir. 1999); *see Wilson*, 442 F.3d at 1327. I may not and will not, however, "prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process." *Wilson*, 442 F.3d at 1327. While I will define the disputed claim terms in this case "with whatever specificity and precision is warranted by the language of the claim[s] and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998); *see Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1373 (Fed. Cir. 2005) (requiring court to distinguish between legal question of claim construction and the factual question of infringement).

Analysis

A.      "Blunt-nosed screw" and "screw"

The parties' primary claim construction dispute concerns the meaning of the terms

"screw" and "blunt-nosed screw" as used in both the '248 and '588 patent.  The parties

agree that the term "screw" as used in these patents means a "blunt-nosed screw."

Claim 1 of the '248 patent is representative of the manner in which the disputed

terms are used in the asserted patents.  It reads, with the disputed terms in italics:

1.      An apparatus for controlling movement of ice and/or snow along a
predetermined area of a sloping surface, said surface including a plurality of
spaced, longitudinal raised portions, said raised portions extending from an
elevated portion of said surface to a lower portion thereof and each being
laterally separated by a base portion, wherein said raised portions are
positioned a greater distance above a reference plane than said base
portions, said apparatus comprising:

clamp means for detachably engaging one of said raised portions,
said clamp means including a body having a longitudinal cavity for
receiving said one raised portion and means for frictionally engaging an
external surface of said one raised portion, said means for frictionally
engaging comprising at least one *blunt-nosed screw* threadably
interconnected to said body, said *screw* being extendable into said cavity to
deform said external surface of said one raised portion, wherein a first of
said clamp means is positionable on a first of said raised portions and a
second of said clamp means is positionable on a second of said raised
portions; and

a cross-member interconnectable with said clamp means, wherein a
first said cross-member extends between and is interconnected with said
first and second clamp means above at least one of said base portions.

The parties agree that the ordinary and customary meaning of "blunt-nosed screw"

to one skilled in the art at the time of the invention is a device with a blunted forward

-8-

end, a shaft or cylinder with a continuous, spirally grooved thread and a tool member

connection, such as a slot to accept a driving device.  The parties also agree that a unitary

structure having these elements is a "blunt-nosed screw."  They do not agree, however,

whether a "blunt-nosed screw" is limited to a unitary structure or whether, as CFE asserts

and Contek disputes, it may also be comprised of several parts.

Neither party points to any intrinsic evidence that defines or addresses, directly or

indirectly, whether the ordinary and customary meaning of a "blunt-nosed screw" to one

skilled in the art of metal roofing encompasses a multi-piece device.  Both parties instead

rely on extrinsic evidence to support their arguments.

Webster's Third New International Dictionary provides several definitions of

"screw" that are potentially relevant here.  The first, relied upon in part by Contek,

defines a "screw" as "a simple machine of the inclined plane type consisting of a spirally

grooved solid cylinder and a correspondingly grooved hollow cylinder of equal

dimensions in which the applied force acts in a spiral path along the grooves while the

resisting force acts along the axis of the cylinder."  Webster's Third New Int'l Dictionary

of the English Language Unabridged 2040 (1993); *see* Merriam Webster's Collegiate

Dictionary 1049 (10th ed. 1995) (reciting a similar definition relied upon by Contek).

Other, related definitions describe a "screw" as "a cylinder with a helical cut groove on

the outer surface . . . used variously (as to fasten, apply pressure, transmit motion, or

make adjustments)," and "a cylindrical fastener that is usu. pointed, that has a head with a

slot or recess, that is helically or spirally threaded, and that is designed for insertion into

material by rotating." Webster's Third New Int'l Dictionary at 2040. While these definitions can be read as suggesting that a "screw" is a unitary structure consisting of a spirally grooved solid cylinder, none definitively addresses this issue.

Webster's Third New International Dictionary offers an alternate definition that more closely addresses this question. This definition states that the term "screw" includes "any of several devices consisting wholly *or partly* of a screw." *Id.* (emphasis added). Under this definition, therefore, the ordinary meaning of the term "screw" includes devices that encompass both a spirally grooved solid cylinder or shaft and additional features or components.

The only evidence in the record regarding the ordinary and customary meaning of the term "screw" in the field of metal roofing is found in the declaration of Robert M. Haddock, the inventor of the '248 and '588 patents. Mr. Haddock testifies there that he has 30 years of experience in the steel and metal construction trades, including more than 15 years in the field of metal roof design and fabrication. Pls.' *Markman* Br., Ex. 1 [hereinafter "Haddock Decl."], ¶ 2. Based on this experience, Mr. Haddock declares that it is well-known in the field of metal roofing that fasteners such as screws come in many different shapes, sizes and configurations, including "threaded shaft-type fasteners that are comprised of multiple components, but are designed to function as a single unit." *Id.* ¶ 8. Mr. Haddock states that such threaded shaft-type, multi-component fasteners are known as "screws" and gives several examples of such devices that are common in the metal building trade. *Id.*

Mr. Haddock's testimony is unrebutted.  Contek contends it nonetheless should be disregarded based on Federal Circuit authority holding that inventor testimony regarding the meaning of patent claims is not entitled to special deference, *see Markman*, 52 F.3d at 983, and that inventor testimony is entitled to little or no consideration when it is "a self-service, after the fact attempt to state what should have been part of his or her patent application." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997).  The testimony by Mr. Haddock relied on here does not fall within this authority because it describes the state of knowledge in the field of metal roofing at the time of the invention, rather than Mr. Haddock's intent and meaning in using the term "screw" in the asserted patents.  In its most recent and comprehensive statement of evidence that district courts may properly rely upon in claim construction, the Federal Circuit specifically authorized consideration of extrinsic evidence, "including expert and inventor testimony," for the purpose of "establish[ing] that a particular term in the patent or prior art has a particular meaning in the pertinent field."  *Phillips*, 415 F.3d at 1317, 1318.  That is precisely the purpose of the inventor testimony cited here and thus it may be considered.

Contek also argues "screw" as used in the asserted patents must be construed to be a unitary structure because this construction is most consistent with the most common English usage of the term.  This may be true, but the dictionary definition recited above as well as Mr. Haddock's testimony indicates that "screw" as used in the metal roofing

field can also encompass multi-part fasteners that include a spirally grooved cylinder or shaft.

"[U]nless compelled otherwise, a court must give a claim term the full range of its ordinary meaning as understood by persons skilled in the relevant art." *Riverwood Int'l*, 324 F.3d at 1357; *Rexnord*, 274 F.3d at 1342.  Before adopting the broadest definition of a term based on a dictionary definition or other extrinsic evidence, however, I must scrutinize the intrinsic evidence to determine if this is the most appropriate definition. *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1349 (Fed. Cir. 2005); *see Phillips*, 415 F.3d at 1322-23, 1324.

Having reviewed the language of the claims, the specification of the asserted patents and relevant prosecutorial history, I find no indication that the term "screw" must be limited to the narrower definition of a unitary structure.  The intrinsic record suggests that "blunt-nosed screw" simply means a fastener with spirally grooved shaft and rounded end that frictionally engages the roof seam.  Nothing in this record indicates a concern with whether this fastener is made up of one or multiple parts.  Based on this and the extrinsic evidence cited above, I hold that the term "blunt-nosed screw" and "screw" as used in the asserted patents is not limited to a unitary structure.

My reasoning and result here is similar to that of the Federal Circuit in *Free Motion Fitness, Inc. v. Cybex International, Inc.*, 423 F.3d 1343 (Fed. Cir. 2005), an infringement action concerning a patent for an exercise apparatus comprising a resistance assembly, two adjustable extension arms that pivot on an axis substantially parallel to the

axis of rotation of a pulley at the end of each arm, and a cable linking the resistance assembly to the arms. *Id.* at 1345.  One of the issues on appeal was the proper construction of the term "adjacent" as used in claims describing the location of the resistance assembly of the exercise machine relative to the pivot point on each of its extension arms. *Id.* at 1345, 1349.  The court observed that the intrinsic evidence did not define the term and that it had no specialized meaning in the relevant art. *Id.* at 1348.  It next identified two definitions of "adjacent" in Webster's Third New International Dictionary that might apply, the first being "not distant" and the second being "relatively near and having nothing of the same kind intervening."[4] *Id.* at 1349.  The court then returned to the intrinsic record and determined that nothing in it suggested a concern with intervening pivot points or excluding any intervening pivot points. *Id.*  Accordingly, the court adopted the broader definition of "not distant" in construing the term "adjacent."  Similarly, I find no concern in the asserted patents for a unitary as opposed to a multi-part screw and therefore also adopt the broader of the possible dictionary definitions of "screw" in finding that the term is not limited to a unitary structure.[5]

---

[4]     The choice between these definitions was material because the accused device had intervening pivot points. *See id.* at 1346, 1348-49.

[5]     I am also guided by the Federal Circuit's decision in *Riverwood International Corp. v. R.A. Jones & Co.*, 324 F.3d 1346 (Fed. Cir. 2003), in which the court considered whether the term "flight bars" was limited to a unitary structure or could include a plurality of pieces.  The court found that the term, which was not defined in either the intrinsic or external evidence, was not limited to a unitary structure because "[n]othing in the claim language, specification, or prosecution history suggests that flight bars must be of unitary structure.  The district court, consistent with our guidance that a

I caution the parties that this decision goes only to the construction of the disputed term "blunt-nosed screw" and in no way finds or suggests that Contek's accused device constitutes a multi-part "blunt-nosed screw" that infringes on CFE's patents. The question of infringement is for the finder of fact, which may well find that one or more of Contek's combinations of a spirally grooved cylinder and blunt-ended ball bearing, "circle-lok" and/or "sure grip pad" does not constitute a "blunt-nosed screw" because it has other functionality or perhaps for other reasons.

    B.    "Member positionable within said first hole and being extendable within said slot" and similar language as used in Claims 20, 43 and 48 of the '588 patent

The parties dispute two elements of this claim language: the meaning of "member" and of "positionable within said hole and being extendable within said slot." The pertinent language of Claim 20 of the '588 patent, with the disputed terms in italics, is representative:

> 20.    A mounting device attachable to a raised portion on a building surface, said mounting device comprising:
> . . .
>
> (d) a securing assembly comprising a first hole extending from one of said side surfaces through said mounting body to interface with said slot and a first *member positionable within said first hole and being extendable within said slot* to secure at least said upper part of said raised portion within said

---

claim term is to be given 'the full range of its ordinary meaning as understood by an artisan of ordinary skill' instructed the jury not to limit the term to the unitary structure found in the specification. We agree with that conclusion." *Id.* at 1358 (quoting *Rexnord*, 274 F.3d at 342).

slot by engaging said upper part of said raised portion within said slot with said first member.

The first disputed term, "member," is defined broadly by common and technical dictionaries to mean a "structural unit such as a . . . beam or tie, or a combination of these" or a "distinct part of a whole." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002) (internal quotations and citations omitted). In *CCS Fitness*, the Federal Circuit found that these definitions encompass units of a larger whole and thus that the term "member" was not limited to single, unitary structure as asserted by the defendant in that case. *See id.*

Contek points to the prosecution history of the '248 and '588 patents to argue that "member" has a more limited meaning in these patents, namely a unitary blunt-nosed screw. CFE concurs that the prosecution statements relied upon by Contek show that Mr. Haddock and his counsel limited "member" to a "blunt-nosed fastening device," Pls.' Report in Further Support of Pls.' *Markman* Positions (Doc. 49) at 9, but dispute that the statements further limited this device to a unitary structure.

I find that the relevant prosecution history establishes that "member" as used in the '588 patent means "blunt-nosed screw." First, Claim 2 of the '248 patent application claimed a means for frictionally engaging that "comprises a *member* extendable from a wall of said cavity to contact said external surface of said one raised portion." Pls.' *Markman* Br., Ex. 3 [hereinafter "'248 patent prosecution history"] 27 (emphasis added). After the Examiner rejected this claim as unpatentable over the prior art Opplinger in

-15-

view of Darnall, Mr. Haddock deleted "member" from the claim and amended it to

provide that the means for frictionally engaging was limited to a "blunt nose screw."

Contek's Br. re: Interpretation of Pls.' Patents (Doc. 35), Ex. D ('248 patent prosecution

history) at 82-83, 110.  This amendment provides insight into what Mr. Haddock

originally claimed as his invention, and what he gave up in order to meet the Examiner's

objections.  *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978 (Fed. Cir. 1999); *see*

*Wang Labs, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999); *see also*

*Phillips*, 415 F.3d at 1317 (prosecution history can demonstrate "how the inventor

understood the invention and whether the inventor limited the invention in the course of

the prosecution, making the claim scope narrower than it otherwise would be.")  Because

the '588 patent derives from the '248 patent and its patent application, this history is

relevant to the '588 patent and its use of this term as well.  *See Wang*, 197 F.3d at 1384;

*Elkay*, 192 F.3d at 980.

The conclusion that Mr. Haddock limited the meaning of the term "member" to

"blunt nosed screw" is also supported by the prosecution history of the '588 patent.  With

respect to several application claims, Mr. Haddock equated the term "member" as used in

these claims with a "screw" and/or the blunt-nosed screw disclosed in the specification.

*See, e.g.*, Contek's Br. re: Interpretation of Pls.' Patents (Doc. 35), Ex. E ('588 patent

prosecution history) at 189-91.  Given that the inventor himself defined "member" to

mean "screw" or "blunt-nosed screw" to obtain issuance, it would be improper to find a

broader construction than this.

-16-

The conclusion does not mean, however, that the term "member" as stated in Claims 20, 43 and 48 must be unitary in structure.  Contek's arguments in this regard are based on its contention that a "screw" or "blunt-nosed screw" can only be a unitary structure.  I reject this contention for the reasons stated earlier in this decision. "Member" as used in the referenced claims means "blunt-nosed screw," which may have either a unitary or multi-part structure.

The referenced claims further require that the "member" or "members" be "positionable within" one or more holes in the "mounting body" and "being extendable within said slot to secure" the upper part of the raised portion "within said slot by engaging" the raised portion within the slot with the member(s).  '588 patent, col. 20, ll. 33-37 (Claim 20); *see id.*, col. 22, l. 66 - col. 23, ll. 3 (Claim 43), col. 23, ll. 7-12 (Claim 48).  These terms are not defined in the claim language, specification or prosecution history, which leads me to consult dictionary definitions to determine their ordinary and customary meaning.

The root of the term "positionable" is the verb "position," whose ordinary meaning as relevant here is "to put in a or the proper position: PLACE, SITUATE."  Webster's Third New Int'l Dictionary at 1769; *see Knopik v. Amoco Corp.*, 96 F. Supp. 2d 892, 905 (D. Minn. 2000), *aff'd*, 95 Fed. Appx. 332 (Fed. Cir. 2004).  The ordinary meaning of "within" as used here is "in the inner or interior part of: INSIDE OF."  Webster's Third New Int'l Dictionary at 2627; *see Watson Indus., Inc. v. Murata Elec. N. Am., Inc.*, 301 F. Supp. 2d 933, 942 (W.D. Wis. 2003), *aff'd*, 115 Fed. Appx. 441 (Fed. Cir. 2004).

It is undisputed that the referenced "hole" is an opening in the "mounting body," which is the metal block or clamp, that extends from the outer surface of the clamp through the clamp body to the slot or cavity that surrounds the metal roof's standing seam.[6]  Given these ordinary meanings and my construction of the term "member" to mean a "blunt-nosed screw," I find the phrase "member positionable within first said hole" means the blunt-nosed screw, whether a unitary or multi-piece structure, is capable of being placed inside the hole that extends through the clamp to the slot surrounding the standing seam. This construction is consistent with the specification of both asserted patents.[7]

The parties agree that the final portion of this disputed language, the phrase "member . . . being extendable into said slot" means that the "member" must be able to enter the slot or cavity of the clamp and physically contact and deform the roof seam. *See* Pls.' Report in Further Support of Pls.' *Markman* Positions (Doc. 49) at 9; Defs.' Br. re: Interpretation of Pls.' Patents (Doc. 35) at 27-28.  This construction is supported by the dictionary definition of the relevant terms and is also consistent with the intrinsic evidence.  Accordingly, I find this phrase means that the "member," construed for the

---

[6]      Claim 20 of the '588 patent, for example, describes the "first hole" as "extending from one of said side surfaces through said mounting body to interface with said slot." '588 patent, col. 20, ll. 32-34.

[7]      CFE asserts that this phrase should be interpreted to mean that the member is "wholly or *partially* positionable within a fastening hole." Jt. Notice & Stip. Concerning *Markman* Hearing (Doc. 54), Ex. 1 (Plaintiffs' proposed interpretation, emphasis added).  The ordinary meaning of a "member positionable within" the fastening hole, however, does not suggest that this requirement is satisfied if only a portion of the member (screw) is capable of placement within the hole.  CFE also fails to cite any intrinsic or external evidence supporting this proposed interpretation.

reasons stated above to mean "blunt-nosed screw," is able to enter the slot of the clamp and physically contact and deform the roof seam.

C.    "Interconnected with" and "securing"

The parties also dispute the meaning of "cross-member interconnected with said clamp means," as stated in Claim 1 of the '248 patent, and "securing a member" as stated in Claims 9 and 32 of the '588 patent.  I address these terms together because the parties' dispute concerning these terms and their opposing constructions of them are the same.

The parties agree that both of these terms address the means by which a cross-member (snowguard) is attached to the clamps mounted on the standing seam of a metal roof.  Their dispute is whether these terms require the cross-member to be directly attached to the clamps using a set screw or whether it may be attached to the clamps by any suitable means, including through use of an intermediate structure such as the brackets employed in Contek's accused products.

Webster's Third New International Dictionary defines "interconnect" to mean "to connect mutually or with one another" and "secure," as relevant here, to mean "to make fast."  Webster's Third New Int'l Dictionary at 1177, 2053; *see also* Random House College Dictionary 1190 (rev. ed. 1980) (defining "secure" to mean "to make firm or fast, as by attaching").  CFE argues that these broad definitions preclude the narrow interpretation of these terms urged by Contek and supports its broader interpretation.  As further support for its position, CFE points to statements in the specifications for the '248 and '588 patents that "any suitable means may be utilized for interconnecting" the clamp

and cross-member, '248 patent, col. 7, ll. 62-63; '588 patent, col. 9, ll. 23-24, and the disclosure in each specification of different ways that the cross-member can be interconnected or secured to the clamp, including through use of an intermediate device that extends from the clamp to the cross-member. *See* '248 patent, col. 3, l. 52 - col. 4, l. 33 & Figures 2b, 6a; '588 patent, col. 4, ll. 40-58 & Figures 2b, 6a. CFE also invokes the doctrine of claim differentiation to support its interpretation, based on a comparison between independent Claim 1 and dependent Claim 14 of the '248 patent.[8]

Contek responds that both "interconnected with" and "securing" are not subject to standard claim construction but rather must be construed under the special rules applying to means-plus-function claim elements. Under these rules, Contek asserts, both terms must be narrowly construed to encompass only a connecting or securing of the cross-

---

[8]     Claim 14 recites:

> The apparatus of claim 1, further comprising first and second extension means detachably connected to said first and second clamp means, respectively, for directly engaging said first cross-member, wherein said first and second extension means allows for increasing distance between at least a portion of said first cross-member and at least one base portion.

'248 patent, col. 12, ll. 50-56.

CFE argues "interconnected with," as used in independent Claim 1must be broad enough to encompass the use of extensions for attaching a cross-member to the mounting clamp, as Claim 14 provides, because otherwise this dependent claim could not exist.

member and the clamp that involves the use of a set screw threaded through the mounting body.

A claim is written in a means-plus-function format if it portrays a function to be executed but provides no instructions as to the structure or materials for executing this function. *See Phillips*, 415 F.3d at 1311.  35 U.S.C. § 112, ¶ 6 restricts claim limitations written in this format to those structures, materials, or acts disclosed in the specification that perform the claimed function, and their equivalents. *Personalized Media Communs., LLC v. ITC*, 161 F.3d 696, 703 (Fed. Cir. 1998).  In other words, a claim using the means-plus-function format "will cover only the corresponding step or structure disclosed in the written description, as well as the step or structure's equivalents. *CCS Fitness*, 288 F.3d at 1369.

The use of the word "means" triggers a rebuttable presumption that § 112, ¶ 6 applies, and the absence of that term creates a rebuttable presumption that it does not apply. *CCS Fitness*, 288 F.3d at 1369; *Personalized Media*, 161 F.3d at 703-04.  Here, the disputed claim terms do not employ the word "means," thereby triggering the rebuttable presumption that the terms are not in the means-plus-function format and that § 112, ¶ 6 does not govern.

Contek may rebut the presumption by demonstrating that the disputed terms fail "to recite sufficiently definite structure or else recite[] a function without reciting sufficient structure for performing that function." *CCS Fitness*, 288 F.3d at 1369 (internal quotations omitted).  The presumption against finding a means-plus-function

form when the word "means" is absent, however, "is a strong one that is not readily overcome." *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1372 (Fed. Cir. 2006). As a result, the Federal Circuit has observed that it has "seldom held that a limitation not using the term 'means' must be considered to be in means-plus-function form." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1362 (Fed. Cir. 2004).

Contek asserts "interconnectable," "interconnected with" and "securing" are all means-plus-function limitations because they describe the function of securing the cross-member and the clamp without disclosing any "actual structure" to perform this function. Contek's Br. re: Interpretation of Pls.' Patents (Doc. 35) at 30. The Federal Circuit, however, has held that this approach is too restrictive, and that a claim recites sufficient structure to avoid application of § 112, ¶ 6 "if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Lighting World*, 382 F.3d at 1359-60. "What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for'." *Id.* at 1360.

The Federal Circuit applied these principles in *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004), to find that the term "connector assembly for connecting each pair of adjacent support members" denoted sufficient structure to avoid construction as a means-plus-function limitation. *Id.* at 1358-63. To reach this

conclusion, the court looked to the dictionary definitions of "connector," defined as "something that connects," and "connect," defined as "to join, fasten, or link together usu. by means of something intervening." *Id.* at 1361. The court found that these definitions demonstrated that the word "connector" as used in the disputed claim had a generally understood meaning as a unit that joins, fastens, or links each pair of adjacent support members. *Id.* This meaning, the court held, denoted sufficient structure to avoid application of § 112, ¶ 6, notwithstanding "[t]he fact that more than one structure may be described by that term, or even that the term may encompass a multitude of structures." *Id.* The court found the term "connector" was a description of structure generally understood by persons in the art, even though it might encompass "any structure that performs the role of connecting." *Id.*

As described above, the terms "interconnected with" and "securing" have essentially the same meaning as "connector" as examined by the Federal Circuit in its *Lighting World* decision. As a result, I also find that they describe sufficient structure to avoid being considered means-plus-functions terms subject to construction under the special principles of § 112, ¶ 6.

Considering the dictionary definitions of these terms, the claims in which they are used, the specifications and prosecution histories, I further find no support for Contek's narrow interpretation of these terms under the ordinary rules of claim construction. Accordingly, I find that these terms, as used in Claim 1 of the '248 patent and Claims 9

and 32 of the '588 patent, mean attaching a member to a roof clamp, either directly or through another device or assembly.

## Conclusion

For the reasons stated above, I construe the claim terms disputed by the parties as follows:

"Blunt-nosed screw" or "screw" as recited in multiple claims in the '248 and '588 patents means a unitary or multi-part device having a rotating tool connection member, a continuous, spirally grooved cylinder or shaft and a rounded end portion.

"Member positionable within first said hole and being extendable with said slot" and similar language as recited in Claims 20, 43 and 48 of the '588 patent means a blunt-nosed screw, whether unitary or multi-part, that is capable of being placed inside the cited hole that extends through the mounting body to the slot surrounding the standing seam in order to enter the slot to physically contact and deform the roof seam.

"Interconnected with" and "securing" as recited in Claim 1 of the '248 patent and Claims 9 and 32 of the '588 patent mean attaching a member to a roof clamp, either directly or through another device or assembly.

Dated this 18th day of June, 2007.

s/John L. Kane
John L. Kane, Senior District Judge
United States District Court